No. 25-20087

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

---

Cyanco International, L.L.C.,

Plaintiff - Appellant,

v.

Minerales de Occidente, S.A. de C.V.,

Defendant - Appellee.

---

On Appeal from the United States District Court
for the Southern District of Texas
No. 4:23-cv-03713

---

## BRIEF OF APPELLANT CYANCO INTERNATIONAL, L.L.C.

---

Samuel E. Joyner, Jr.
Thomas F. Allen, Jr.
Ben A. West
FROST BROWN TODD LLP
2101 Cedar Springs Road, Suite 900
Dallas, Texas 75201
Telephone: (214) 545-3472
sjoyner@fbtlaw.com
tfallen@fbtlaw.com
bwest@fbtlaw.com

*Counsel for Appellant*
*Cyanco International, L.L.C.*

## CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made so that the judges of this Court may evaluate possible disqualification or recusal.

1.    Cyanco International, L.L.C. (Cyanco), Appellant, is a Delaware limited liability company with its principal place of business in Sugar Land, Texas. Cyanco is wholly owned by one member: Cyanco Holding Corporation. No publicly held corporation holds a 10% or greater ownership interest in Cyanco.

2.    Minerales de Occidente, S.A. de C.V. (Minosa), Appellee, is a Sociedad Anónima de Capital Variable formed under the laws of Honduras with its principal place of business in la Union Copan, Honduras. Minosa is a wholly owned indirect subsidiary of Aura Minerals, Inc., a publicly traded multi-national mining company. No other publicly held corporation holds a 10% or greater ownership interest in Minosa.

**Plaintiff-Appellant**

Cyanco International, L.L.C.

**Trial and Appellate Counsel**

Samuel E. Joyner, Jr.
Ha-Vi Nguyen
FROST BROWN TODD LLP
2010 Cedar Springs Road, Suite 900
Dallas, Texas  75201
(214) 545-3472

ii

**Appellate Counsel**

Thomas F. Allen, Jr.
Ben A. West
FROST BROWN TODD LLP
2010 Cedar Springs Road, Suite 900
Dallas, Texas  75201
(214) 545-3472

**Defendant-Appellee**                **Trial and Appellate Counsel**

Minerales de Occidente, S.A. de C.V    J. Brian Vanderwoude
                                       Monica Niewiarowski
                                       DORSEY & WHITNEY LLP
                                       200 Crescent Court, Suite 1600
                                       Dallas, Texas 75201
                                       (214) 981-9900

Dated: July 24, 2025                   _/s/ Samuel E. Joyner, Jr._
                                       Samuel E. Joyner, Jr.

                                       *Attorney of Record for Appellant*
                                       *Cyanco International, L.L.C.*

## STATEMENT REGARDING ORAL ARGUMENT

Pursuant to Federal Rule of Appellate Procedure 34(a) and Fifth Circuit Rule 28.2.3, Appellant Cyanco International, L.L.C. respectfully requests oral argument. This appeal involves the intersection of state contract law and federal export controls, as well as a substantial summary-judgment record. Oral argument will meaningfully assist the Court's analysis of the merits of this appeal.

# TABLE OF CONTENTS

Certificate of Interested Persons ............................................................. ii

Statement Regarding Oral Argument ...................................................... iv

Table of Contents ..................................................................................... v

Table of Authorities .............................................................................. viii

Jurisdictional Statement ........................................................................... 1

Introduction .............................................................................................. 2

Statement of the Issues ............................................................................ 5

Statement of the Case .............................................................................. 6

I.      The Department of Commerce, Bureau of Industry and Security (BIS), regulates the export of most commercial items from the United States .............. 6

    A.      Certain commercial items may be exported only with a BIS-issued export license. ...................................................... 7

    B.      BIS investigates potential export violations and may, depending on the circumstances and severity of a given violation, impose sanctions. ...................................................... 8

II.     Cyanco sells and exports sodium cyanide to Minosa in Honduras. ................... 10

    A.      Cyanco manufactures and ships sodium cyanide to domestic and foreign customers. ...................................................... 10

    B.      In 2018, Cyanco enters into an exclusive sales contract with Minosa to supply sodium cyanide for Minosa's gold-mining operation in Honduras. ...................................................... 11

    C.      In 2022, the parties' relationship sours: Minosa repeatedly demands price concessions and Cyanco inadvertently ships sodium cyanide in excess of the 2019 License's maximum volume. ...................................................... 14

    D.      Within 30 days of Minosa's notice of breach, Cyanco obtains a new license from BIS to export sodium cyanide to Minosa. ................... 15

    E.      Cyanco self-reports the excess shipments to BIS, which issues only a "warning letter." ...................................................... 16

III.    Despite Cyanco's corrective measures, Minosa purports to terminate the Sales Contract, after which Cyanco sues for breach of the contract. .......... 17

IV.     On the eve of trial, the district court sua sponte grants summary judgment for Minosa. ...................................................... 19

Summary of the Argument ................................................................ 20

Standard of Review ......................................................................... 22

Argument ......................................................................................... 23

I.    The district court erred in ruling that Cyanco failed to "maintain" its export license in violation of the Sales Contract. ................................. 23

    A.    The ordinary meaning of the Sales Contact is clear: to "maintain" a license means to keep that license in a state of validity. ....................... 23

        1.    The word "maintain" has multiple definitions. .............................. 24

        2.    In the context of the Sales Contract, the most apt meaning of "maintain" is to keep an export license valid ............. 26

    B.    Under the EAR, excess exports do not automatically invalidate an export license. ................................................................ 30

        1.    Under the EAR, an export license issued by BIS is "valid" for a set period of time until it expires or is suspended or revoked. ................................................................ 31

        2.    An export license does not "lapse" or automatically become invalid when a licensee violates the terms of the license. ................................................................ 32

    C.    Cyanco "maintained" its export license at all times: the "period of validity" for Cyanco's export license did not expire and BIS did not revoke or suspend the license. ................................. 33

II.    The district court erred in ruling that Cyanco's alleged breach could not be "cured" and that Minosa's termination of the Sales Contract was therefore valid. ................................................................ 36

    A.    The district court erred in ruling that Cyanco's alleged breach was "incurable." ................................................................ 38

        1.    BIS confirmed that Cyanco cured its violation by obtaining the 2023 License. ................................................. 38

        2.    Minosa's "incurable breach" authorities were not decided under Texas law and bear no factual resemblance to this case. ................................................................ 39

        3.    Minosa's speculation about future civil penalties fails to establish that Cyanco's alleged breach was incurable. ................ 41

    B.    Minosa failed to meet its summary judgment burden to establish that Cyanco did not "effectively cure" the alleged breach. ..................... 42

III.    Summary judgment may not be affirmed on Minosa's "excuse"
argument. ............................................................................................................. 46

Conclusion............................................................................................................... 48

Certificate of Service ............................................................................................... 50

Certificate of Compliance........................................................................................ 50

# TABLE OF AUTHORITIES

**Cases**                                                                 **Page(s)**

*AgTech Sci., LLC v. Blue Circle Dev., LLC,*
No. 19-cv-118, 2020 WL 1975375 (E.D. Ky. Apr. 24, 2020).............................35, 40

*Anderson v. Liberty Lobby, Inc.,*
477 U.S. 242 (1986) ....................................................................................................... 22

*Angus Chem. Co. v. Glendora Planation, Inc.,*
782 F.3d 175 (5th Cir. 2015) .............................................................................26, 29, 35

*Barnes v. Emp. Dep't,*
15 P.3d 599 (Or. Ct. App. 2000)................................................................................... 29

*Baylor Cnty. Special Util. Dist. v. City of Seymour,*
709 S.W.3d 5 (Tex. App.—Eastland 2025, pet. filed) ................................................. 12

*Bd. of Regents of Univ. of Tex. Sys. v. IDEXX Labs., Inc.,*
691 S.W.3d 438 (Tex. 2024) ................................................................................... 27, 28

*Biden v. Nebraska,*
600 U.S. 477 (2023) ....................................................................................................... 28

*Big Three Welding Equip. Co. v. Crutcher, Rolfs, Cummings, Inc.,*
229 S.W.2d 600 (Tex. 1950) ...................................................................................25, 27, 33

*Capio Funding, L.L.C. v. Rural/Metro Operating Co., L.L.C.,*
35 F.4th 353 (5th Cir. 2022) ................................................................................... 22, 27

*Crowe v. Henry,*
115 F.3d 294 (5th Cir. 1997) ................................................................................... 45, 48

*D&D Realty Trust v. Borgeson,*
No. 14-ADMS-40044, 2015 WL 5098626 (Mass. Dist. Ct. 2015).......................35, 40

*Elmen Holdings, L.L.C. v. Martin Marietta Materials, Inc.,*
86 F.4th 667 (5th Cir. 2023) ......................................................................................... 23

*Fed. Eng'rs & Contractors, Inc. v. Relyant Global, LLC,*
No. 3:19-CV-73, 2022 WL 19763248 (E.D. Tenn. Aug. 11, 2022).......................... 39

*Finley Res., Inc. v. Headington Royalty, Inc.*,
    672 S.W.3d 332 (Tex. 2023) ...................................................................... 24, 26, 27, 36

*FinServ Cas. Co. v. Symetra Life Ins. Co.*,
    941 F.3d 795 (5th Cir. 2019) ...................................................................................... 45

*Flowers v. Tex. Mil. Dep't*,
    391 F. Supp. 3d 655 (S.D. Tex. 2018) ........................................................................ 29

*Henry v. Masson*,
    333 S.W.3d 825 (Tex. App.—Houston [1st Dist.] 2010, no pet.) ........................... 46

*James Constr. Grp. v. Westlake Chem. Corp.*,
    650 S.W.3d 392 (Tex. 2022) ...................................................................................... 46

*Johnson v. Sawyer*,
    120 F.3d 1307 (5th Cir. 1997) ............................................................................. 23, 45

*Jones v. Cain*,
    600 F.3d 527 (5th Cir. 2010) ...................................................................................... 23

*Jones v. New Orleans Reg'l Physician Hosp. Org., Inc.*,
    981 F.3d 428 (5th Cir. 2020) ...................................................................................... 22

*Kyle v. Williams*,
    98 S.W.3d 661 (Tenn. 2003) ....................................................................................... 29

*Kyung Sik Kim v Idylwood, N.Y., LLC*,
    66 A.D.3d 528 (N.Y. App. Div. 2009) .................................................................. 35, 40

*Ladner v. Prop. Owners Ass'n of Mountain Lakes Ranch, Inc.*,
    No. 07-21-00210-CV, 2023 WL 424846 (Tex. App.—Amarillo 2023,
    no pet.) ........................................................................................................ 26, 28, 29, 30

*Las Americas, Inc. v. Am. Indian Neighborhood Dev. Corp.*,
    No. A04-505, 2004 WL 2710061 (Minn. Ct. App. Nov. 30, 2004) ......................... 40

*In re Lee W. Enters.*,
    179 B.R. 204 (Bankr. C.D. Cal. 1995) .................................................................. 35, 40

*LG Ins. Mgmt. Servs., L.P. v. Leick*,
    378 S.W.3d 632 (Tex. App.—Dallas 2012, pet. denied) ........................................... 44

*Liberty Ins. Corp. v. Dixie Elec., L.L.C.*,
637 F. App'x 113 (5th Cir. 2015) ...................................................................41, 42, 47

*Marzett v. McCraw*,
511 S.W.3d 210 (Tex. App.—Dallas 2015, pet. denied) ........................................... 28

*Morath v. Lampasas Indep. Sch. Dist.*,
686 S.W.3d 725 (Tex. 2024) ................................................................................ 24, 28

*Mustang Pipeline Co., Inc. v. Driver Pipeline Co., Inc.*,
134 S.W.3d 195 (Tex, 2004) ....................................................................................... 46

*Mustang Park Owners Ass'n, Inc. v. Lumley*,
No. 02-22-00192-CV, 2024 WL 3897116 (Tex. App.—Fort Worth
Aug. 22, 2024, no pet.) ........................................................................................ 26, 30

*Neurobehavioral Assocs., P.A. v. Cypress Creek Hosp., Inc.*,
995 S.W.2d 326 (Tex. App.—Houston [1st Dist.] 1999, no pet.) ..................... 37, 44

*Nola Spice Designs, L.L.C. v. Haydel Enters., Inc.*,
783 F.3d 527 (5th Cir. 2015) ..................................................................................... 22

*O'Brien's Resp. Mgmt., L.L.C. v. BP Expl. & Prod., Inc.*,
24 F.4th 422 (5th Cir. 2022) ............................................................................... 46, 47

*Orix Corp. Mkts., L.L.C. v. Wash. Mut. Bank*,
260 S.W.3d 620 (Tex. App.—Dallas 2008, no pet.) .....................................26, 29, 35

*Owasso Indep. Sch. Dist. No. I-011 v. Falvo*,
534 U.S. 426 (2002) .................................................................................................... 26

*Point Energy Partners Permian, LLC v. MRC Permian Co.*,
669 S.W.3d 796 (Tex. 2023) ................................................................................ 26, 28

*Trinity Indus., Inc. v. Ashland, Inc.*,
53 S.W.3d 852 (Tex. App.—Austin 2001, pet. denied)............................................. 23

*Universal Health Servs., Inc. v. Renaissance Women's Grp., P.A.*,
121 S.W.3d 742 (Tex. 2003) ................................................................................ 44, 45

**Statutes**

28 U.S.C. § 1291 ............................................................................................................ 1

28 U.S.C. § 1332 ................................................................................................................. 1

50 U.S.C. §§ 4801-4852 ..................................................................................................... 6

TEX. TRANSP. CODE § 521.021 .......................................................................................... 28

TEX. TRANSP. CODE § 521.271 .................................................................................... 29, 35

TEX. TRANSP. CODE § 521.292 .......................................................................................... 35

TEX. TRANSP. CODE § 521.294 .......................................................................................... 35

TEX. TRANSP. CODE § 521.297 .......................................................................................... 29

## Rules and Regulations

15 C.F.R. §§ 730-774 .......................................................................................................... 6

15 C.F.R. § 748.1 ................................................................................................................ 7

15 C.F.R. § 750.7 .......................................................................................................*passim*

15 C.F.R. § 750.8 .............................................................................................................. 31

15 C.F.R. § 758.4 .............................................................................................................. 31

15 C.F.R. § 764.2 ............................................................................................8, 32, 34, 41

15 C.F.R. § 764.3 .......................................................................................................... 9, 10

15 C.F.R. § 764.5 ........................................................................................................8, 9, 34

15 C.F.R. § 764.6 .............................................................................................................. 10

15 C.F.R. § 766.24 ............................................................................................................ 10

15 C.F.R. § 766, Supp. 1 ...........................................................................................*passim*

15 C.F.R. § 774, Supp. 1 .................................................................................................... 7

FED. R. CIV. P. 56 .............................................................................................................. 22

## Other Authorities

BLACK'S LAW DICTIONARY (12th ed. 2024) ....................................................................... 25

ERIC L. HIRSCHHORN, BRIAN J. EGAN & EDWARD J. KRAULAND,
U.S. EXPORT CONTROLS & ECONOMIC SANCTIONS (4th ed. Oxford
Univ. Press 2022) ........................................................................................................ 6, 7

MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY (11th ed. 2003) ............. 24, 25, 27, 33

OXFORD ENGLISH DICTIONARY (2d ed. 1989) .................................................................. 25

ANTONIN SCALIA & BRYAN A. GARNER, READING LAW:
THE INTERPRETATION OF LEGAL TEXTS (2012) ............................................. 26, 27, 32

RANDOM HOUSE DICTIONARY OF THE ENGLISH LANGUAGE
(2d ed. 1987) .................................................................................................................... 26

SOC'Y FOR MINING, METALLURGY & EXPL. (SME),
*The Safe and Effective Use of Cyanide* (Mar. 2021)
https://smenet.blob.core.windows.net/smecms/sme/media/smeazu
restorage/about%20sme/pdf%20files/technical%20briefings/safean
deffectiveuseofcyanidefinal-03262021.pdf ............................................................. 10, 11

U.S. DEP'T OF COMM., BUREAU OF INDUS. & SEC., OFFICE OF EXP.
SERVS., *Introduction to Commerce Dep't, Export Controls* (Nov. 27, 2018),
www.bis.doc.gov/index.php/documents/regulations-docs/142-eccn-
pdf ...................................................................................................................................... 8

## JURISDICTIONAL STATEMENT

Appellant Cyanco International, L.L.C. (Cyanco) filed a breach of contract action against Minerales de Occidente, S.A. de C.V. (Minosa), in federal court on the basis of diversity jurisdiction. 28 U.S.C. § 1332. Minosa moved for summary judgment, seeking dismissal of Cyanco's claim and the grant of its claim for declaratory judgment. ROA.90-174. On March 11, 2025, the district court granted Minosa's summary-judgment motion. ROA.1399-1410. Cyanco timely filed its Notice of Appeal on March 13, 2025. ROA.1411-12. This Court has jurisdiction pursuant to 28 U.S.C. § 1291.

## INTRODUCTION

This is a breach of contract action by Cyanco International, L.L.C. (Cyanco), against its former customer, Minerales de Occidente, S.A. de C.V. (Minosa), which operates a gold mine in Honduras. ROA.11-22, 115, 201-02. Cyanco is a Texas-based producer of sodium cyanide, a chemical used in gold mining. ROA.11, 201. In 2018, the parties executed a requirements sales contract, under which Minosa would purchase sodium cyanide from Cyanco for its mining operation. ROA.213-35.

The contract required Cyanco to "maintain" export licenses to ship its product to Minosa in Honduras. ROA.220, 232. In 2019, Cyanco obtained an export license from the Department of Commerce, Bureau of Industry and Security (BIS), the federal agency that regulates commercial export licenses. ROA.236-37. The license was valid for four years and authorized the shipment of 8,000 metric tons of sodium cyanide. ROA.236.

In 2023, after failing to extract price concessions from Cyanco, Minosa purported to terminate the contract on the ground that Cyanco had failed to "maintain" its export license because Cyanco had inadvertently exceeded the maximum shipping volume authorized by the license. ROA.207-08, 261-62. But Cyanco's license was still valid: it had not expired, nor had it been suspended or revoked by BIS. ROA.211. Moreover, upon learning of the excess exports, Cyanco immediately obtained a new license—on April 14, 2023, well within the contract's 30-day cure window—and self-reported its oversight to BIS. ROA.1311-12. After investigating, BIS found that

Cyanco's excess exports were a "good faith" mistake, nothing more, and issued a "warning letter" without imposing any sanctions.  ROA.269-70.  In its letter, BIS expressly stated that both the past excess exports and future exports were covered by Cyanco's new license.  ROA.269.

Nonetheless, Minosa—having found a new supplier—insisted that the excess exports constituted an incurable breach and terminated the contract, prompting Cyanco to bring the lawsuit below.  ROA.11-24, 261-62, 277-78.  During the course of litigation, the district court twice denied Minosa's requests for summary judgment but, just days before the March 2025 jury trial was set to begin, the district court sua sponte reconsidered and granted Minosa summary judgment.  ROA.295, 664-65, 1399-1410.

The district court's ruling must be reversed.  Minosa's theory of breach conflates a breach of the contractual duty to "maintain" an export license with a violation of the license's scope, regardless whether that violation had any real-world impact on Cyanco's performance.  Under the applicable export regulations, an export license is valid until it expires, or the BIS suspends or revokes it.  A license is not automatically invalidated or "lapsed"—to use Minosa's term—whenever a violation occurs.

By the same token, the district court erred in accepting Minosa's theory that the excess exports were "incurable" as a matter of law, and thus that Minosa's termination of the contract was valid.  From the beginning, Minosa has insisted Cyanco could not "go back in time" and remedy the excess exports.  ROA.108.  But according to BIS— the federal agency in charge—Cyanco not only can do so, it did.  In its Warning Letter,

BIS expressly stated that the exports in question, past and future, were covered by a valid license. In other words, the unrebutted evidence showed that the excess exports were, in fact, cured. The district court's order does not acknowledge the BIS letter.

Equally erroneous is Minosa's alternate theory that Cyanco failed to "effectively cure" the excess exports by not notifying it of the 2023 license sooner. No such notice requirement exists in the contract; at most, the summary-judgment evidence reveals a fact question.

Even if Minosa could prove a breach, it could not prove a "material" breach excusing future performance, and did not show its entitlement to summary judgment on that ground. Under Texas law, a breach must be "material" to excuse the other party's performance. At a minimum, there are fact questions as to whether the excess exports (assuming they breached the contract) were "material": these include whether the excess exports could be cured (they were) and whether Cyanco acted in good faith (BIS found that it did). Moreover, Minosa asserted, and the district court appeared to agree, that it was excused from performing because BIS might still somehow sanction it for being part of the excess exports, even though BIS itself had expressly told Cyanco, the exporter, it was in the clear. This speculative and self-defeating argument is insufficient to carry Minosa's summary judgment burden.

## STATEMENT OF THE ISSUES

1.  Did the district court err in granting summary judgment in favor of Minosa and concluding as a matter of law that Cyanco had breached the parties' contract by inadvertently exporting some product beyond the maximum scope of its export license, when:

    a.  the contract required Cyanco only to "maintain" its export license;

    b.  at the time of the alleged breach, Cyanco's export license was "valid"—it had not expired and had not been suspended or revoked; and

    c.  under the export regulations, Cyanco's excess exports were a "violation" that did not cause the license to "lapse" or be automatically invalidated?

2.  Did the district court err in granting summary judgment on the ground that Cyanco's alleged breach was "incurable as a matter of law," and thus that Minosa's termination of the contract was proper, when:

    a.  the excess exports were cured by Cyanco's 2023 export license, which Cyanco obtained within the 30-day notice-and-cure provision of the parties' contract;

    b.  the governing federal agency, BIS, confirmed in its Warning Letter that the 2023 license retroactively covered the excess exports;

    c.  Minosa simply speculated that Cyanco's excess exports might expose it to liability; and

      d.     neither the parties' contract nor Texas law supports Minosa's alternative theory of "effective breach"?

3.    Did the district court err in granting summary judgment on the ground that Cyanco's excess exports excused Minosa's performance under the contract, when:

      a.     there are fact questions as to whether the excess exports were an allegedly material breach;

      b.     Cyanco's 2023 export license cured any such breach; and

      c.     Minosa's speculation about possible liability was not competent summary judgment evidence and is foreclosed by the uncontroverted BIS Warning Letter?

## STATEMENT OF THE CASE

## I.    The Department of Commerce, Bureau of Industry and Security (BIS), regulates the export of most commercial items from the United States.

The export of most commercial goods from the United States falls under the jurisdiction of the U.S. Department of Commerce, pursuant to the Export Control Reform Act of 2018, 50 U.S.C. §§ 4801-4852.[1] These exports are governed by the Export Administration Regulations (EAR), 15 C.F.R. §§ 730-774, which the

---

[1] *See* ERIC L. HIRSCHHORN, BRIAN J. EGAN & EDWARD J. KRAULAND, U.S. EXPORT CONTROLS & ECONOMIC SANCTIONS, xxv & n.6 (4th ed. Oxford Univ. Press 2022). Export controls on other items, such as sensitive military or nuclear technology and equipment, are regulated by other agencies, such as the Department of State or Department of Energy. *Id.* at xxv-xxvii & nn.7-9.

Department of Commerce administers through its Bureau of Industry and Security (BIS).[2]

### A.    Certain commercial items may be exported only with a BIS-issued export license.

The EAR dictate whether an exporter needs a BIS-issued license to export a good or commodity to another country.[3]  For example, commercial goods with a "dual use" "i.e., having recognized civilian and military applications"—may require an export license.[4]  "Dual use" goods range from "sophisticated items such as computers" to "commonplace goods [like] hammers, nails, and shoelaces."[5]  Dual-use goods can also include chemicals and chemical agents.[6]

If an export license is required, the exporter must submit a license application to BIS.[7]  Once the application is approved, BIS will issue a license, which displays an individual license number.  15 C.F.R. § 750.7(b).  Under the EAR, an export license has a "License validity period," which usually lasts four years.  *Id.* § 750.7(g).  An "expiration date" is printed on the license itself, as BIS explains in a publication for exporters:

---

[2]  *Id.* at 3-4.

[3]  *See id.* at 25-78 (describing the process for determining export regulatory compliance, including whether an export license is required).

[4]  *Id.* at xxiv-xxv.

[5]  *Id.*

[6]  *See* 15 C.F.R. § 774, Supp. 1, Cat. 1 (Category 1 of the Commerce Control List: "Special Materials and Related Equipment, Chemicals, 'Microorganisms,' and 'Toxins.'").

[7]  *See* 15 C.F.R. § 748.1(d) (providing that all export and reexport license applications must be electronically filed via BIS's SNAP-R system); HIRSCHHORN, ET AL. at 94-107.

If your application is approved, you will receive a license number and expiration date to use on your export documents. A BIS-issued license is usually valid for four years.[8]

Licenses for commodities will also contain "a quantity and dollar value limit." *Id.* § 750.7(f). The "authorization" under the license "is limited by both the quantity and value listed on the license." *Id.*

### B. BIS investigates potential export violations and may, depending on the circumstances and severity of a given violation, impose sanctions.

BIS's Office of Export Enforcement (OEE) investigates potential export violations. 15 C.F.R. § 766, Supp. 1 § II. Under the EAR, a "violation" includes "engag[ing] in any transaction or tak[ing] any other action prohibited by or contrary to … [the] ECRA, the EAR, or any order, license or authorization issued thereunder." 15 C.F.R. § 764.2.

An OEE investigation may be triggered by a number of causes, including an exporter's own "voluntary self-disclosure." *Id.* § 764.5. BIS "strongly encourages" exporters to make prompt, voluntary disclosures of any possible violation, large or small. *Id.* § 764.5(a). If a violation has occurred, OEE will consider a "voluntary self-disclosure [to be] a mitigating factor in determining what administrative sanctions, if any," OEE seeks to impose. *Id.* § 764.5(b)(4).

---

[8] U.S. Dep't of Comm., Bureau of Indus. & Sec., Office of Exp. Servs., *Introduction to Commerce Dep't, Export Controls*, at 8 (Nov. 27, 2018), www.bis.doc.gov/index.php/documents/regulations-docs/142-eccn-pdf.

At the conclusion of its investigation, OEE may take various steps. *See id.* § 764.3 ("Sanctions"). The EAR recognize that "[m]any apparent violations are isolated occurrences, the result of good-faith misinterpretation, or involve no more than simple negligence or carelessness." 15 C.F.R. § 766, Supp. 1 § III ("Factors Affecting Administrative Sanctions"). Thus, the EAR expressly contemplate how to address "minor or technical violations," such as "inadvertent record keeping violations" committed without "aggravating factors." *Id.* § 764.5(c).

In the cases of such "minor or technical" violations, OEE may decide to take "no action" against the exporter. 15 C.F.R. § 766, Supp. 1 § II.A.-B. ("Types of Responses to Apparent Violations"). Alternatively, OEE may issue a "warning letter," without taking any adverse action against an exporter's license. *Id.* § II.B. A "warning letter" may issue for a variety of reasons, including to "address an apparent violation of a minor or technical nature, where good faith efforts to comply with the law and cooperate with the investigation are present." *Id.* A warning letter is also appropriate "where the investigation commenced as a result of a voluntary self-disclosure satisfying the requirements of § [C.F.R.] 764.5 [concerning voluntary self-disclosure] of the EAR, provided that no aggravating factors exist." *Id.*

More serious violations, particularly when accompanied by aggravating factors like "willful" or "reckless" conduct, may merit more serious consequences, including formal civil proceedings and the revision, suspension, or even revocation of the export license. 15 C.F.R. § 764.3; *id.* § 766, Supp. 1 § II.C, G & § III. Other administrative

penalties may include monetary fines, denial of future export privileges, or forfeiture of seized property. *Id.* § 764.3(a), (c); *id.* § 766, Supp.1 § II.C.-E, G-H. During an investigation and other proceedings, BIS may order that the violator's export privileges be temporarily suspended. *Id.* §§ 764.6(c), 766.24. OEE may also refer violations to the Department of Justice for criminal prosecution. *Id.* § 764.3(b); § 766, Supp. 1 § II.F.

## II.   Cyanco sells and exports sodium cyanide to Minosa in Honduras.

This dispute arises from the exporter-importer relationship between Cyanco, a producer and supplier of sodium cyanide, and its customer, Minosa, which operates a gold mine in Honduras. ROA.11-22.

### A.   Cyanco manufactures and ships sodium cyanide to domestic and foreign customers.

Headquartered in Sugar Land, Texas, Cyanco (along with its affiliates) is a leading producer and supplier of sodium cyanide to the gold mining industry. ROA.201. A signatory to the International Cyanide Management Code (ICMC), Cyanco's sodium cyanide manufacturing facilities are fully ICMC-accredited. ROA.201. Cyanco serves customers in North America, Latin America, and Africa. ROA.200-01.

Sodium cyanide is produced by treating hydrogen cyanide with sodium hydroxide. ROA.201. While cyanide itself is "an acute toxin," it is used in a greatly diluted form in the gold-mining industry to "dissolve gold from ore."[9] In an "open pit"

---

[9]  *See* Soc'y for Mining, Metallurgy & Expl. (SME), *The Safe and Effective Use of Cyanide* (Mar. 2021) at 1-2,
(Continued)

mining operation, gold ore is removed from the ground and then "crushed" by heavy machinery into small pieces. ROA.115-16, 202. Liquid sodium cyanide in a diluted solution is then applied as a "reagent" to the gold. ROA.201.[10] "Once the gold is dissolved," it is processed and "smelted into gold bullion."[11] This process, known as "cyanidation" or "cyanide leaching," "has been the dominant gold extraction technology since the 1970s."[12]

While cyanide leaching requires sodium cyanide to be in liquid form, shipping liquid sodium cyanide overseas is not economically feasible because the liquid form is too heavy. ROA.202. So manufacturers like Cyanco dry liquid sodium cyanide into solid, crystalline "briquettes," which are much lighter and thus feasible for overseas shipping. ROA.201-02.

### B. In 2018, Cyanco enters into an exclusive sales contract with Minosa to supply sodium cyanide for Minosa's gold-mining operation in Honduras.

Minosa operates an "open pit, heap-leach" gold mining operation in Copán, western Honduras. ROA.115-16, 202. Minosa's mine, known as the San Andres Mine, uses sodium cyanide to extract gold from the mined ore. ROA.115-16, 202-03. In

---

https://smenet.blob.core.windows.net/smecms/sme/media/smeazurestorage/about%20sme/pdf%20files/technical%20briefings/safeandeffectiveuseofcyanidefinal-03262021.pdf.

[10] *See also* SME, *supra* note 9 at 1.

[11] *Id.*

[12] *Id.*

2015, Cyanco obtained an export license and began exporting solid sodium cyanide to Minosa. ROA.669.

In November 2018, Minosa and Cyanco entered an exclusive Sales Contract for the sale and shipment of sodium cyanide to Minosa's mining operation. ROA.213-235 [R.E. Tab 8]. Under this "Requirement Contract," Minosa agreed to purchase from Cyanco "100%" of Minosa's annual requirement of sodium cyanide up to a maximum of 3,700 metric tons each year. ROA.218.[13] Minosa further agreed to purchase up to 90% of the maximum tonnage per year. ROA.218. Cyanco agreed to deliver the sodium cyanide to Minosa at Puerto Cortés, a port city on the north coast of Honduras. ROA.219, 229. Minosa would then transport the product to the San Andres Mine. ROA.229.

It is undisputed that an export license is necessary to export sodium cyanide from the United States to Honduras. ROA.97-98. In the 2018 Sales Contract, Cyanco and Minosa agreed to "maintain" licenses for the export and import of Minosa's sodium cyanide orders. This agreement appears in two provisions of the Sales Contract:

- **§ 12.2 ("Licenses and Registrations"):** "The Buyer [Minosa] and Seller [Cyanco] agree to maintain all licenses, permits, authorizations and registrations required to be held by each Party under applicable Laws for purposes of manufacturing, transporting, using, handling and disposing of Product."

---

[13] Under Texas law, a requirements contract is one where "the buyer agrees to purchase all the specified goods it requires from the seller to the exclusion of third parties." *Baylor Cnty. Special Util. Dist. v. City of Seymour*, 709 S.W.3d 5, 12-13 (Tex. App.—Eastland 2025, pet. filed).

- **Schedule 1 ("Specific Purchase Conditions") § 4.5:** "Seller agrees to maintain export licenses for the Mine Site and Buyer agrees to maintain import licenses and meet all regulatory requirements to permit the Seller's sale of the Product to the Buyer."

ROA.220, 232.[14]

The Sales Contract contains a termination provision, which includes a notice-and-cure mechanism.  Under Section 1.3, either party may terminate the contract "with thirty (30) days prior written notice . . . *if* the other Party: … (ii) is in breach of any term of this Contract, including failure to pay, *and* fails to remedy such breach within thirty (30) days after its receipt of written notice detailing the breach from the non-breaching Party."  ROA.214 (emphasis added).

Pursuant to the contract, Cyanco applied for and obtained another export license.  ROA.236-37.  In August 2019, BIS issued to Cyanco Export License D1170758 ("the 2019 License") to export 8,000 tons of sodium cyanide to Minosa in Honduras.  ROA.236-37 [R.E. Tab 5].  The license displays a validity period of four years: the license was "Validated" on August 13, 2019 and "Expires" on August 31, 2023.  ROA.236.

The parties amended the Sales Contract multiple times.  Under the Second Amendment, effective January 1, 2021, the parties "update[d] the volumes and the

---

[14]  The parties also agreed generally to "comply with all applicable laws and governmental rules, regulations and orders."  ROA.227 (Sales Contract § 19.8).

pricing of the [sodium cyanide] Product and renew[ed] the Term" of the Sales Contract through 2026. ROA.142. Specifically, Minosa increased the purchase amount to 100% of its annual requirement of sodium cyanide, up to 5,400 metric tons each year. ROA.143. The parties also agreed that the Sales Contract and its amendments would be governed by Texas law. ROA.144.

### C.    In 2022, the parties' relationship sours: Minosa repeatedly demands price concessions and Cyanco inadvertently ships sodium cyanide in excess of the 2019 License's maximum volume.

Less than three months after signing the Second Amendment to the Sales Contract, Minosa began seeking price concessions from Cyanco. In May 2022, Minosa showed Cyanco a "Comparison Cost Table" with lower price quotes from two of Cyanco's direct competitors. ROA.205, 244-45. The next month, Minosa demanded that the parties "urgently negotiate and get new prices and terms for Minosa." ROA.205, 246. Though they exchanged further correspondence, the parties reached no agreement regarding prices. *See* ROA.205-06, 244-250.

In January 2023, Minosa accused Cyanco of breaching the Sales Contract "by failing to deliver Product in accordance with Buyer's Purchase Orders." ROA.206, 253-54. Cyanco explained that the shipment at issue would be delivered early. ROA.206, 256. A few weeks later, Minosa repeated its concerns about Cyanco's pricing, but no new price agreement was reached. ROA.206.

On March 30, 2023, Minosa again accused Cyanco of breaching the Sales Contract, but this time for a different reason. In a letter entitled "Notice of Breach,"

Minosa claimed that Cyanco had "breached the Contract by failing to maintain the export license required to be held by Seller under Sections 8.8 and 12.2 of the Contract." ROA.257 [R.E. Tab 9]. Minosa stated that while the 2019 License allowed Cyanco to ship up to 8,000 metric tons of sodium cyanide to Minosa, Cyanco had shipped "at least 10,600 metric tons." *Id.* Minosa demanded that Cyanco "take immediate action to remedy the Default and perform its obligations in accordance with the Contract." *Id.* Minosa also stated its intention to buy the sodium cyanide "from another source." *Id.*

On April 6, 2023—and contrary to the district court's recitation of facts— Cyanco responded to Minosa's notice. ROA.258 [R.E. Tab 10].[15] Cyanco informed Minosa that it was "looking into the matter identified," after pointing out that no breach had occurred because Minosa's letter "itself concede[d] the Export License's existence." *Id.* Cyanco's subsequent investigation determined that, as of March 2023, Cyanco had inadvertently exceeded the maximum volume of the 2019 License by 2,640 metric tons. ROA.207.

### D. Within 30 days of Minosa's notice of breach, Cyanco obtains a new license from BIS to export sodium cyanide to Minosa.

To rectify this oversight, Cyanco applied for and obtained another export license. ROA.207. On April 14, 2023—15 days after the date of Minosa's March 30 Notice of Breach—BIS issued Export License D1317335 (the "2023 License"), which permitted

---

[15] In its summary judgment order, the district court erroneously stated that Minosa "receiv[ed] no response from Cyanco" to the March 30 notice. ROA.1406.

Cyanco to export 24,000 metric tons of solid sodium cyanide to Minosa in Honduras. ROA.259-260 [R.E. Tab 6].  The 2023 License has a four-year validity period: it was "Validated" on April 14, 2023, and "Expires" on April 30, 2027.  ROA.259.

### E.    Cyanco self-reports the excess shipments to BIS, which issues only a "warning letter."

In accordance with the EAR, Cyanco also promptly self-reported to BIS that it had exceeded the quantity allowed by the 2019 License.  ROA.209, 269.  OEE conducted an investigation.  ROA.269.  At the conclusion of its investigation, OEE issued Cyanco a "Warning Letter," dated June 5, 2023.  ROA.269-70 [R.E. Tab 7].

In the Warning Letter, OEE summarized its findings.  OEE found that Cyanco's excess shipments were "a result of human error with regard to personnel changes within the company."  ROA.269.  In OEE's view, "the mistake by Cyanco International was made in good faith and no harm to national security took place due to the [excess] export."  *Id.*

OEE noted that Cyanco had obtained a new BIS-approved license "for the excess exports" and, "as such, ***the excess exports as well [as] future exports*** will be under this new license."  *Id.* (emphasis added).  OEE also noted that Cyanco had "since recognized the error and [] taken proactive measures to ensure the same mistake does not re-occur in the future."  *Id.*

Based on these findings, OEE determined that no administrative or criminal penalties were warranted.  ROA.269-270.  OEE closed the matter with the Warning

Letter only. *Id.* Cyanco's export license was never revoked, suspended, or placed on any probationary status. ROA.211.

## III. Despite Cyanco's corrective measures, Minosa purports to terminate the Sales Contract, after which Cyanco sues for breach of the contract.

Meanwhile, Minosa purported to terminate the Sales Contract. On April 19, 2023—less than three weeks after demanding that Cyanco "remedy" the excess shipments and "perform" under the contract—Minosa sent Cyanco a "Notice of Termination." ROA.261-262 [R.E. Tab 11]. Citing Sections 12.2 and 4.5 of the Sales Contract, Minosa argued that Cyanco had failed to "maintain" an export license by shipping 2,640 metric tons beyond the volume limit of the 2019 License. ROA.261.

Minosa also asserted that Cyanco's alleged breach was "incurable" on the ground that (according to Minosa) Cyanco could not "go back in time to fix" the excess exports. ROA.261-262. Minosa expressed its "fear" that the excess exports had already exposed it to potential liability for violating federal law. ROA.262. Based on this fear, Minosa declared that it could no longer legally do business with Cyanco and that it had "no choice but to terminate the Contract and procure Product from an alternate supplier." ROA.261-262. Minosa's purported termination date was May 19, 2023. ROA.262.

On April 26, Cyanco responded, explaining that Minosa's fears were unfounded. ROA.263 [R.E. Tab 12]. Cyanco denied that it had breached the Sales Contract and stated that it had "fully discharged its obligation to deliver the Product to Buyer and stands ready to do so." *Id.* Cyanco therefore demanded that Minosa resume its

obligations under the contract. *Id.* In response, Minosa reiterated its assertion that Cyanco had "export[ed] Product to [Minosa] without a valid export license to do so." ROA.264. Minosa also repeated its belief that it could not legally do business with Cyanco. *Id.*

Further correspondence ensued. ROA.265-268. On June 19, 2023, Cyanco sent Minosa copies of the BIS Warning Letter and the 2023 License; these documents, Cyanco explained, belied Minosa's assertion that Cyanco had ever operated without an export license or could not lawfully export sodium cyanide to Minosa in Honduras. ROA.1323-28. Minosa disagreed, asserting that Cyanco had allowed its 2019 License to "lapse" in breach of the Sales Contract, justifying termination. ROA.277-278.

In October 2023, Cyanco filed suit against Minosa in federal court. ROA.11-24. Cyanco claimed breach of the Sales Contract and sought actual damages, attorney's fees, costs, and interest. ROA.20-22. Minosa answered and asserted a counterclaim for a declaratory judgment that Cyanco had breached the Sales Contract, had not cured any breach, and that Minosa was excused from performing and had validly terminated the contract. ROA.43-58.

In March 2024, Minosa moved for summary judgment, seeking dismissal of Cyanco's claim as well as a summary judgment ruling in its favor on its declaratory judgment claim. ROA.90-174. The basis for Minosa's motion was the contention that Cyanco had failed to "maintain" a valid export license when it shipped the excess sodium cyanide, as required by the Sales Contract. ROA.95-105. According to Minosa,

this alleged breach was "incurable" and rendered Minosa's performance impracticable because BIS might investigate or even sanction Minosa, or alternatively, that Cyanco had not cured. ROA.108-113. Minosa also argued that Cyanco's alleged breach excused Minosa's own performance and justified the termination of the Sales Contract. ROA.105-107.

Cyanco filed a response, to which it attached multiple exhibits. ROA.183-278. Minosa filed a reply. ROA.286-294. On April 22, 2024, the district court denied Minosa's motion in a written order. ROA.295. Discovery and other pre-trial matters followed. *See* ROA.296-396, 662-1398.

In September 2024, Minosa again moved for summary judgment, seeking the dismissal of Cyanco's breach of contract claim and relying on a new, unsworn expert report. ROA.397-481. Cyanco opposed the motion and moved to strike the expert report. ROA.483-97, 530-647. The district court denied both motions. ROA.664-665.

## IV.    On the eve of trial, the district court sua sponte grants summary judgment for Minosa.

The parties proceeded with pre-trial matters and the case was eventually set for a jury trial on March 17, 2025. ROA.296-396, 662-1398. The court conducted a pretrial hearing on March 6, 2025. ROA.1587-1640. Most of the hearing was dedicated to exhibits and other matters pertaining to trial. ROA.1587-1634. But at the end of the hearing, the district court announced that it would, sua sponte, reconsider its April 22, 2024 order denying Minosa's original motion for summary judgment. ROA.1635-1639

[R.E. Tab 13]. The court invited the parties to file supplemental submissions in support of or in opposition to the motion. ROA.1637. Cyanco accepted the Court's invitation and filed a Supplement to its opposition to Minosa's summary-judgment motion. ROA.1242-1330.[16]

On March 11, 2025, the district court entered a written order vacating its earlier denial of Minosa's original motion for summary judgment and granting the motion. ROA.1399-1410 [R.E. Tab 4].[17] The court dismissed Cyanco's breach of contract claim and granted Minosa's claim for declaratory relief. ROA.1409-1410. This appeal followed. ROA.1411-1413 [R.E. Tab 2].

## SUMMARY OF THE ARGUMENT

Summary judgment should be reversed. *First*, the district court erred in ruling that Cyanco's inadvertent exports in excess of the 2019 License's maximum volume meant that Cyanco had failed to "maintain" the license and thus had breached the Sales Contract. ROA.1399-1410. This theory cannot be reconciled with the language of the

---

[16] In its Supplement, Cyanco resubmitted the Declaration of Hartono Wijaya, ROA.1252-1330, which was identical to the declaration supporting Cyanco's original Response to Minosa's Motion for Summary Judgment, ROA.183-278, except that it contained as an exhibit a corrected letter among the parties, which had been inadvertently omitted. ROA.1243, 1323-1328. Though Minosa did not raise an issue with or otherwise object to the prior inclusion of the incorrect letter, Cyanco—in an abundance of caution—resubmitted the Wijaya Declaration including the correction, as an exhibit to its Supplement. ROA.1408.

[17] In the Order, the court stated that it was granting Minosa's motion for summary judgment, filed on March 1, 2024 (ECF No. 17). ROA.1404. Together with that motion, the court considered Cyanco's response in opposition to the motion (ECF No. 21); Minosa's reply in support of its motion (ECF No. 24); and Cyanco's Supplement (ECF No. 71). ROA.1404 [Order at 6 & n.5].

contract or with the operation of the EAR export controls. Under the ordinary meaning of "maintain" in this context, Cyanco was obliged to keep its export license valid—which it indisputably did. The license had not expired, nor had it been suspended or revoked. Under the EAR, Cyanco's inadvertent shipment of the excess exports was a "violation" of the license's scope. Such a violation does not automatically render an export license invalid or cause it to "lapse," as Minosa insisted.

*Second*, even if Cyanco breached the Sales Contract, the district court erred in ruling that the breach was "incurable" as a matter of law, and thus that Minosa's termination of the contract was proper. The BIS Warning Letter confirms that the excess exports were not merely curable—they were, in fact, cured. The Sales Contract allows Cyanco to cure a breach within 30 days of notice of the breach; Cyanco obtained the 2023 License within this timeframe. BIS explained that the 2023 License covered the excess exports, as well as future exports, thus remedying Cyanco's violation of the 2019 License. This fact alone precludes summary judgment.

Minosa alternatively argued that Cyanco's cure was not "effective" because Cyanco did not alert Minosa about the 2023 License and Warning Letter until June 2023. But the Sales Contract does not require Cyanco to provide Minosa **any** notice of its cure; this Court, applying Texas law, should not imply such a provision to the contract, particularly when Minosa never argued below for an implied covenant. At a minimum, the sufficiency of Cyanco's notice to Minosa creates another fact question.

*Third*, summary judgment must be reversed because, even if the excess exports were a breach of the parties' contract, there are fact questions as to whether that alleged breach was material and thus whether Minosa's performance under the contract was excused. To justify its termination of the contract, Minosa speculated that it might be prosecuted for abetting Cyanco's excess exports. These concerns are sheer speculation, not summary judgment evidence. And the BIS expressly noted that both future **and previous** exports would be covered under the new license, eliminating any possibility that Minosa could be prosecuted. ROA.269.

## STANDARD OF REVIEW

"This court reviews a grant of summary judgment *de novo*, applying the same standard as the district court." *Jones v. New Orleans Reg'l Physician Hosp. Org., Inc.*, 981 F.3d 428, 432 (5th Cir. 2020). Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." *Id.* (internal citations omitted). A "dispute about a material fact is 'genuine' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court reviews all evidence in the light most favorable to the nonmovant and draws all reasonable inferences in that party's favor. *Nola Spice Designs, L.L.C. v. Haydel Enters., Inc.*, 783 F.3d 527, 536 (5th Cir. 2015). The interpretation of a contract is a legal question reviewed de novo, subject to governing

state law. *Capio Funding, L.L.C. v. Rural/Metro Operating Co., L.L.C.*, 35 F.4th 353, 356 (5th Cir. 2022).

## ARGUMENT

### I. The district court erred in ruling that Cyanco failed to "maintain" its export license in violation of the Sales Contract.

Central to this appeal is the district court's erroneous conclusion that Cyanco failed to "maintain" its license to export sodium cyanide to Minosa and therefore breached the Sales Contract. This is a question of Texas law, which governs the contract. ROA.143. *See Elmen Holdings, L.L.C. v. Martin Marietta Materials, Inc.*, 86 F.4th 667, 677-78 (5th Cir. 2023) (in diversity cases, state law determines whether a party has breached a contract). Under Texas law, "[w]here the evidence is undisputed regarding a person's conduct under a contract, the court alone must determine whether such conduct shows performance or a breach of a contractual obligation." *Trinity Indus., Inc. v. Ashland, Inc.*, 53 S.W.3d 852, 868 (Tex. App.—Austin 2001, pet. denied).

### A. The ordinary meaning of the Sales Contact is clear: to "maintain" a license means to keep that license in a state of validity.

In its summary-judgment motion, Minosa argued that Cyanco breached two provisions of the Sales Contract: Section 12.2 of the contract and Section 4.5 of the contract's "Specific Purchase Conditions" (SPC). ROA.103-04.[18] These provisions use

---

[18] In its summary-judgment reply brief, Minosa argued that Cyanco breached not only these provisions, but also Section 19.8 of the Sales Contract, which generally requires the parties to "comply with all applicable laws and government rules, regulations, and orders." ROA.289. Summary judgment cannot be affirmed on this basis. "Arguments raised for the first time in a reply brief are (Continued)

the same word—"maintain"—to impose similar requirements: that Cyanco "maintain all licenses…required to be held by each Party under applicable Laws for purposes of…transporting" Minosa's sodium cyanide (§ 12.2) and, more specifically, "maintain export licenses for the Mine Site" in Honduras (SPC § 4.5). ROA.220, ROA.232.[19] The question of Cyanco's alleged breach therefore "comes down to the meaning of a single word," *Finley Res., Inc. v. Headington Royalty, Inc.*, 672 S.W.3d 332, 339 (Tex. 2023): the Sales Contract's requirement that Cyanco "maintain" licenses to export sodium cyanide to Minosa in Honduras.

### 1.     The word "maintain" has multiple definitions.

Under Texas law, the "primary objective" of contract interpretation is "to ascertain and give effect to the intentions the parties have objectively manifested in the written instrument." *Id.* When a contractual term is "undefined," the Texas Supreme Court will "generally consult dictionaries for the term's commonly understood meaning." *Morath v. Lampasas Indep. Sch. Dist.*, 686 S.W.3d 725, 735 (Tex. 2024).

---

generally waived," *Jones v. Cain*, 600 F.3d 527, 541 (5th Cir. 2010), and the Court may affirm summary judgment only on a ground the movant "at least proposed or asserted in [the district] court." *Johnson v. Sawyer*, 120 F.3d 1307, 1316 (5th Cir. 1997). Even if properly before the Court, this underdeveloped theory still fails based on the unrebutted evidence that the excess exports were "cured" by the 2023 License, and that the excess exports were not a "material" breach, thus providing Minosa no basis on which to terminate and cease performing under the Sales Contract. *See* Argument II-III, *infra*.

[19] In its motion, Minosa also invoked the "Incoterms CIF" as a further source of the obligation to "maintain" export licenses, but not as a separate contractual obligation. ROA.98-99, 103. Thus, the same analysis applies to all the contractual provisions Minosa cited.

But the word "maintain" does not have a single, "ordinary" meaning. Dictionaries reveal definitions that vary widely in their meaning. The Merriam-Webster's Collegiate Dictionary, for example, lists the following definitions:

1. to keep in an existing state (as of repair, efficiency, or validity): preserve from failure or decline <*maintain* machinery>

2. to sustain against opposition or danger: uphold and defend <*maintain* a position>

3. to continue or persevere in: CARRY ON, KEEP UP <couldn't *maintain* his composure>

4. (a) to support or provide for <has a family to *maintain* > (b) SUSTAIN <enough food to *maintain* life >

5. to affirm in or as if in argument: ASSERT <*maintained* that the earth is flat>

MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 749 (11th ed. 2003). Black's Law Dictionary contains six definitions, while the Oxford English Dictionary contains 16 definitions, some with subpart variants and a number of obsolete usages. *See Maintain*, BLACK'S LAW DICTIONARY 1139 (12th ed. 2024); *Maintain*, OXFORD ENGLISH DICTIONARY 223-24 (2d ed. 1989).

Courts applying Texas law have also noted the range of definitions for the word "maintain." In *Big Three Welding Equip. Co. v. Crutcher, Rolfs, Cummings, Inc.*, 229 S.W.2d 600, 603 (Tex. 1950), the Texas Supreme Court cited these definitions:

- "To keep up, preserve, bear the costs of, keep unimpaired, keep in good order, repair." *Id.* (quoting BLACK'S LAW DICTIONARY (3d ed.)).

- "To hold or keep in any particular state or condition especially in a state of efficiency or validity; to support, sustain or uphold; to keep up; not to suffer to fail or decline." *Id.* (quoting WEBSTER'S NEW INT'L DICTIONARY).

The U.S. Supreme Court consulted dictionaries to determine the meaning of "maintain" as used in a federal statute concerning educational records; there, the Court applied the definition, "to keep in existence or continuance; preserve; retain." *See Owasso Indep. Sch. Dist. No. I-011 v. Falvo*, 534 U.S. 426, 432-33 (2002) (quoting RANDOM HOUSE DICTIONARY OF THE ENGLISH LANGUAGE 1160 (2d ed. 1987)). Similarly, in *Orix Capital Markets*, the Dallas Court of Appeals noted the definitions of "maintain" from *Big Three Welding* and *Owasso*. *Orix Corp. Mkts., L.L.C. v. Wash. Mut. Bank*, 260 S.W.3d 620, 624 (Tex. App.—Dallas 2008, no pet.).[20]

### 2. In the context of the Sales Contract, the most apt meaning of "maintain" is to keep an export license valid.

The Court's first interpretative task is to choose "the applicable definition" of "maintain" from among the various meanings. *See Angus Chem.* 782 F.3d at 184. Where "a common English word[] [has] a number of dictionary definitions," the reader "should assume the contextually appropriate ordinary meaning, unless there is reason

---

[20] Other judicial opinions, from this Court and Texas appellate courts, follow a similar approach. *See Angus Chem. Co. v. Glendora Planation, Inc.*, 782 F.3d 175, 184 (5th Cir. 2015) (citing definitions of "maintain" from multiple dictionaries); *Mustang Park Owners Ass'n, Inc. v. Lumley*, No. 02-22-00192-CV, 2024 WL 3897116, at *8-*9 (Tex. App.—Fort Worth Aug. 22, 2024, no pet.) (citing dictionary definitions and caselaw); *Ladner v. Prop. Owners Ass'n of Mountain Lakes Ranch, Inc.*, No. 07-21-00210-CV, 2023 WL 424846, at *4 (Tex. App.—Amarillo 2023, no pet.) (same).

to think otherwise." ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 70 (2012). *See also Finley*, 672 S.W.3d at 339-40.

Context is "a primary determinant of meaning." *Point Energy Partners Permian, LLC v. MRC Permian Co.*, 669 S.W.3d 796, 808 (Tex. 2023) (quoting SCALIA & GARNER, READING LAW 167). "The subject matter of the document (its purpose, broadly speaking) is the context that helps to give words meaning—that might cause *draft* to mean a bank note rather than a breeze." SCALIA & GARNER, READING LAW 56. Context also includes the "[c]ommercial setting, trade custom, and trade usage" of the contractual language, *Finley*, 672 S.W.3d at 344, as well as "the realities" the contractual term was "meant to address." *Bd. of Regents of Univ. of Tex. Sys. v. IDEXX Labs., Inc.*, 691 S.W.3d 438, 445 (Tex. 2024).

In its Order, the district court "adopt[ed] the Texas Supreme Court's definition" of "maintain" from the *Big Three Welding* opinion. ROA.1405. This "definition," however, was a string of multiple—and different—definitions listed in *Big Three Welding*: "[t]o keep up, preserve, bear the cost of, keep unimpaired, [or] keep in good order." *Id.* Minosa urged a somewhat narrower definition: "to keep in existence; preserve; retain." ROA.286 [Reply at 1 n.1]. Neither expressly embraced the following definition, which also appears in the *Big Three Welding* opinion:

> "To hold or keep in any particular state or condition especially in a state of efficiency or **validity**."

27

229 S.W.2d at 603 (emphasis added). As noted, the Merriam-Webster Collegiate Dictionary contains a similar definition: "to keep in an existing state (as of repair, efficiency, or validity)." MERRIAM-WEBSTER COLLEGIATE DICTIONARY 749.[21]

Context shows that this third definition fits most closely here. The "purpose" of the Sales Contract is to effectuate the sale and export of sodium cyanide from Cyanco in the United States to Minosa in Honduras. *Point Energy*, 669 S.W.3d at 808 (A "vital part" of the context is "the *purpose* of the text." (emphasis in original)). To help achieve that purpose, the Sales Contract imposes a duty on Cyanco to "maintain" export licenses. ROA.218, ROA.232. So, to determine the applicable definition of "maintain," "it is necessary to ascertain the nature of the obligation, that is, what [Cyanco] must do to satisfy the duty." *Ladner*, 2023 WL 424846, at *4.

As discussed above, a BIS-issued export license authorizes a seller like Cyanco to deliver goods to a customer location outside the United States. To effectuate the export—to "address" "the realities" of exporting goods, *IDEXX Labs.*, 691 S.W.3d at 445—Cyanco must therefore obtain and use an export license during its "validity period." *See* 15 C.F.R. § 750.7(g) (providing for a "License validity period"). ROA.192.

This definition comports with common sense. *See Morath*, 686 S.W.3d at 738 (quoting *Biden v. Nebraska*, 600 U.S. 477, 512 (2023) ("Context also includes common

---

[21] As this Court has noted, "lexicographers" consider Merriam-Webster's Collegiate Dictionary to be "one of 'the most useful and authoritative for the [modern] English language generally and for law." *Capio Funding*, 35 F.4th at 357 n.9 (5th Cir. 2022) (Willett, J.) (citing SCALIA & GARNER, READING LAW 419-23).

sense.") (Barrett, J., concurring)).    As every holder of a driver's license knows, a license—once issued—must be kept valid to enable the license-holder to keep driving. In Texas, for example, the state requires an individual to "possess a valid driver's license[] when that person is operating a motor vehicle on a public highway." *Marzett v. McCraw*, 511 S.W.3d 210, 212 (Tex. App.—Dallas 2015, pet. denied) (citing TEX. TRANSP. CODE § 521.021).    A license is valid for a certain period of time until it is renewed, or unless it is suspended or revoked.    TEX. TRANSP. CODE §§ 521.271, 521.297(a).  Thus, when a driver's license is revoked, suspended, or otherwise restricted, the driver can be said to have failed to "maintain" a driver's license.    *See Flowers v. Tex. Mil. Dep't*, 391 F. Supp. 3d 655, 665-66 (S.D. Tex. 2018) (job requirement to "maintain a valid driver's license" was not met by employee whose driver's license was restricted).[22]

Other definitions of "maintain" do not fit as closely.    Based largely on *Orix Capital Markets*, Minosa's preferred definition is "to keep in existence or continuance; preserve; retain."    But the context of *Orix Capital Markets* was different: there, the contract required a party to "maintain" funds at a bank by not depleting funds from an account, as opposed to "maintain" a license.  260 S.W.3d at 624-25.  If anything, keeping

---

[22] *See also Barnes v. Emp. Dep't*, 15 P.3d 599, 601-02 (Or. Ct. App. 2000) (driver whose license was suspended failed to "maintain his driver's license"); *Kyle v. Williams*, 98 S.W.3d 661, 665 (Tenn. 2003) (contractor must "maintain a valid license," which means "possessing a valid license").

a license "in existence" imposes a lower bar on the parties to the Sales Contract than keeping a license "valid."[23]

The same is true for contractual obligations to "maintain" a pipeline or real property. In those contexts, "maintain" may mean to "preserve from failure or decline," *Angus Chem.*, 782 F.3d at 184 (pipeline), or to take "routine action to keep something operational or in a specified state," *Ladner*, 2023 WL 424846, at *4. *See also Mustang Park*, 2024 WL 3897116, at *13 (duty to "maintain" a greenbelt in residential area as "to keep it in its existing—i.e., originally designed—state"). But an export license is not a parcel of land to be mowed or a machine to be serviced; it is an authorization to engage in certain conduct—exporting goods from the United States—which may take place only while the license is valid. What matters is that the holder keep the authority to deliver the product, not that the holder remain free from any misstep—no matter how minor—in complying with the conditions of the license.

## B.  Under the EAR, excess exports do not automatically invalidate an export license.

Based on the applicable ordinary meaning of "maintain," the Sales Contract's requirement therefore asks what Cyanco must do to keep its BIS-issued export license valid—or, as Minosa argued, "in existence." *See Ladner*, 2023 WL 424846, at *4 ("it is necessary to ascertain the nature of the obligation" to "maintain"). This question is

---

[23]  To the extent keeping a license "in existence" is roughly equivalent to keeping a license "valid," Minosa does not really dispute the ordinary meaning of "maintain" in this context.

answered by the EAR rules for export licenses and the license itself. In short: a BIS-issued license is valid until it expires or is suspended or revoked. *See* ROA.190-94, 211. As the BIS made clear—but Minosa ignored—an export license does not "lapse" or automatically become invalid when a license-holder violates the terms of the license.

1.    **Under the EAR, an export license issued by BIS is "valid" for a set period of time until it expires or is suspended or revoked.**

The EAR explain what it means for an export license to be "valid." The EAR state that each export license has a "validity period," which usually lasts four years. 15 C.F.R. § 750.7(g) ("License validity period."). The license itself reflects its validity period, showing two dates: the date on which the license was "Validated" (i.e., became valid) and the date on which the license "Expires." ROA.236-37. Elsewhere, the EAR confirm that a license expires on a specific date. Under 15 C.F.R. § 758.4(b) ("Shipments against expiring license"), a license "expires" ***upon a specific date***: "Any item requiring a license that has not departed from the final U.S. port of export by midnight of the expiration date on an export license may not be exported under that license" unless certain conditions are met. 15 C.F.R. § 758.4(b).

The EAR also explain when and how an export license ceases being valid. As noted, a license will expire at the end of its "License validity period." 15 C.F.R. § 750.7(g). A license may also be suspended or revoked by BIS as part of a sanction for violations by the exporter. 15 C.F.R. § 750.8 ("Revocation or suspension of licenses."). But until BIS takes one of those actions, the license remains "valid." *See id.*

### 2.    An export license does not "lapse" or automatically become invalid when a licensee violates the terms of the license.

A license is **not** automatically invalidated any time an exporter violates the scope of the license, the EAR, or other federal laws.  Minosa's entire theory of breach hinged on this notion—that Cyanco's inadvertent shipping of sodium cyanide beyond the maximum tonnage allowed by the 2019 License caused that license to "lapse" and therefore breached the Sales Contract.  ROA.104-112.  This theory finds no support in the EAR, on which Minosa otherwise relied.

The EAR defines the "validity" of an export license separately from the scope of the license.  15 C.F.R. § 750.7 addresses "Issuance of Licenses."  Subsection (f) ("Quantity of commodities authorized") provides that "commodities will be approved with a quantity and dollar value limit" and that "the authorization is limited by both the quantity and value listed on the license."  15 C.F.R. § 750.7(f).  In contrast, subsection (g) addresses the "validity" of a license.  And, as discussed, a "License validity period" is measured in terms of time, usually four years from the date the license was issued.  15 C.F.R. § 750.7(g).  The placement of these two concepts—validity and scope—in separate subsections, with separate definitions, further suggests that the "validity" of a license is not a function of the "quantity of commodities authorized."  *See* SCALIA & GARNER, READING LAW 232 ("[T]he word being defined is the most significant element of the definition's context"); *id.* at 221 ("The title and headings are permissible indicators of meaning.").

Elsewhere, the EAR confirm this point. Under the regulations, shipping more than the quantity authorized by a license is a "violation" under the EAR. The EAR define a "violation" as an "action prohibited by or contrary to … [the] ECRA, the EAR, or any order, license or authorization issued thereunder." 15 C.F.R. § 764.2(a). As the BIS Warning Letter noted, exceeding the "quantity" of commodities authorized by an export license meets the definition of "violation." ROA.269.

But it is just as clear from the regulations that not every "violation" results in a "lapse" or "termination" of a license. The EAR provide a detailed framework for addressing "violations." As noted previously, the OEE investigates potential violations by exporters, and has discretion to impose sanctions—or not—depending on a number of factors, including the exporter's voluntary self-reporting and the seriousness of the violation. *See supra* Statement of the Case, Section II.B. But again, here the OEE simply issued a Warning Letter and expressly stated that the prior excess exports were covered under the new license—indisputably establishing that a valid license covered both the prior and future exports, meaning no exports were unlawful. ROA.269.

## C. Cyanco "maintained" its export license at all times: the "period of validity" for Cyanco's export license did not expire and BIS did not revoke or suspend the license.

Under the EAR framework, Cyanco "maintained" the validity of its export license at all times. In April 2023, when Minosa purported to terminate the Sales Contract, Cyanco's export license had not expired. Its "validity period" under the EAR, 15 C.F.R. § 750.7(g), lasted until August 31, 2023. ROA.190-94, 211, 236. Moreover,

BIS had not suspended or revoked Cyanco's license. ROA.211. As discussed, OEE issued a "Warning Letter" finding that Cyanco's violation was the product of a "good faith" mistake and that the 2023 License would cover both the past excess exports and future exports. ROA.269. Because Cyanco kept its export license "in a state of … validity," it "maintained" the license for purposes of the Sales Contract. *See Big Three Welding*, 229 S.W.2d at 603; MERRIAM-WEBSTER COLLEGIATE DICTIONARY 749; ROA.190-94. The same is true even under Minosa's proffered definition: in April 2023, Cyanco's export license was still in "existence," as Cyanco pointed out to Minosa. ROA.258.

In the district court, Minosa argued that Cyanco's excess exports automatically caused the First License to "lapse" or somehow cease to exist. ROA.104-113. At the January 2023 pre-trial hearing, for example, Minosa' counsel argued:

> So, what we found out is for a one-year period there was no license in place. They were shipping the cyanide with no export license to do so . . . . Because a license is either limited by date or by quantity, whichever occurs first.

ROA.1547-48.

As a factual matter, that assertion is incorrect: Cyanco had an unexpired license "in place." ROA.236-37. Minosa also misstated the operation of the EAR. Again, a license is "valid" for a period of time, usually four years. 15 C.F.R. § 750.7(g). Exceeding the scope of the license is a "violation." 15 C.F.R. § 764.2. A "violation" by a license-holder may trigger an investigation. 15 C.F.R. §§ 764.5; 15 C.F.R. § 766,

Supp. 1 § II.  An investigation, in turn, may result in the license being invalidated.  *Id.* After an OEE investigation, BIS "may take" various "administrative actions," including "License Revision, Suspension or Revocation."  *Id.*; 15 C.F.R. § 766, Supp. 1 § II.G ("BIS authorizations to engage in a transaction pursuant to a license or license exception may be revised, suspended or revoked in response to an apparent violation . . . .").  But a violation does not, without some adverse action by OEE, automatically invalidate the license or cause it to "lapse."[24] And—despite having the regulatory authority to do so—the BIS here ***did not*** revoke Cyanco's prior export license as an administrative action in response to Cyanco's voluntary disclosure.  ROA.269.

Again, the drivers' license example is instructive.  In general, a drivers' license is valid for a certain number of years.[25]  Speeding is a violation of law and the terms of the license, but does not automatically render the license invalid; only a Department of Public Safety determination suspending or revoking the license will have that effect.[26]

---

[24]  For this reason, Minosa's authorities regarding "lapsed" contractual obligations are inapplicable. *See Orix Cap. Markets*, 260 S.W.3d at 625 (party maintained (i.e., kept in existence; preserved; retained) bank account by keeping funds in the account and making deposits as it had throughout the parties' agreement); *Angus Chem.*, 782 F.3d at 184 (observing that "to keep in an existing state; preserve or retain" is one of "the most applicable definitions of 'to maintain'"); *AgTech Sci., LLC v. Blue Circle Dev., LLC*, No. 19-cv-118, 2020 WL 1975375, at *4 (E.D. Ky. Apr. 24, 2020) (failure to maintain licenses and conduct business in compliance with the law); *D&D Realty Trust v. Borgeson*, No. 14-ADMS-40044, 2015 WL 5098626, at *4 (Mass. Dist. Ct. 2015) (intermittent failure to maintain insurance); *Kyung Sik Kim v Idylwood, N.Y., LLC*, 66 A.D.3d 528, 529 (N.Y. App. Div. 2009) (failure to "continuously maintain[] insurance coverage as required by their commercial lease,"); *In re Lee W. Enters.*, 179 B.R. 204, 209 (Bankr. C.D. Cal. 1995) (dealership's failure to maintain continuous operations).

[25]  TEX. TRANSP. CODE § 521.271.

[26]  Further, license suspension or revocation is appropriate when there are exacerbating factors, such as habitual recklessness, multiple violations, causing serious personal injury or property damage, or failure to pass an examination.  TEX. TRANSP. CODE §§ 521.292, 521.294.

TEX. TRANSP. CODE §§ 521.292, 521.294.  Here, Cyanco's excess exports—the export equivalent of speeding—was a violation but did not render the export license invalid. *See* 15 C.F.R. § 766, Supp. 1 § II; ROA.269-70.

The analysis would be different if Cyanco had continued shipping product to Minosa after the First License expired.  Under that scenario, the "License validity period" would have ended and the license itself would no longer be valid.  And under the most "contextually appropriate" ordinary meaning, Cyanco would have failed to "maintain" its license.  *See also Finley*, 672 S.W.3d at 339-40.  But that is not what happened.  The license remained valid at all times, notwithstanding Cyanco's inadvertent violation.  ROA.211.

## II. The district court erred in ruling that Cyanco's alleged breach could not be "cured" and that Minosa's termination of the Sales Contract was therefore valid.

Summary judgment must be reversed for another reason.  Even if Cyanco breached the Sales Contract, there are at least fact questions as to whether Cyanco "cured" its breach and thus whether Minosa properly terminated the Sales Contract, contrary to the district court's ruling.  ROA.1399-1410.[27]

Section 1.3 of the Sales Contract specifies the circumstances under which a party may terminate the contract.  Under Section 1.3, a party may terminate the contract "with

---

[27]  This issue includes the district court's declarations that Minosa had the right to terminate the contract, did not breach the contract, and validly terminated the contract.  ROA.1409-10.

thirty (30) days prior written notice (without prejudice to its other rights and remedies) *if* the other Party:

(i)     becomes insolvent, makes an assignment for the benefit of its creditors, is placed in receivership, liquidation or bankruptcy; or

(ii)     is in breach of any term of this Contract, including failure to pay, **and** fails to remedy such breach within thirty (30) days after its receipt of written notice detailing the breach from the non-breaching Party."

ROA.214 (emphasis added).

To terminate the Sales Contract, Minosa had to comply with the terms of Section 1.3. *See Neurobehavioral Assocs., P.A. v. Cypress Creek Hosp., Inc.*, 995 S.W.2d 326, 332 (Tex. App.—Houston [1st Dist.] 1999, no pet.) (non-breaching party had to comply with contractual termination provision to properly terminate the contract). Invoking Section 1.3(ii), Minosa argued, and the district court agreed, that Cyanco had "breached" the Sales Contract and could not cure that breach as a matter of law. ROA.105-07, 1408.[28] Alternatively, Minosa argued that Cyanco did not "effectively" cure the excess exports in compliance with Section 1.3 because it did not communicate enough information to Minosa. ROA.107-112.

Both arguments are wrong. Far from "incurable," Cyanco's alleged breach was cured by the 2023 License, as BIS confirmed in its Warning Letter. And Section 1.3 contains no requirement that Cyanco provide Minosa with **any** notice, let alone define what an "effective" cure might be. This Court should not imply such a term to the

---

[28] Minosa did not allege that Cyanco became insolvent or met any other criteria under subsection (i).

Sales Contract. At most, the summary judgment evidence reveals a genuine question of material fact as to whether Cyanco "cured" the alleged breach in accordance with Section 1.3, and thus whether Minosa properly terminated the contract.

### A. The district court erred in ruling that Cyanco's alleged breach was "incurable."

Since it first discovered the excess exports, Minosa has argued that Cyanco's alleged breach was "incurable" as a matter of law. ROA.107-112. In its correspondence and then in its summary-judgment filings, Minosa insisted that "there is simply no way to go back in time" to remedy the excess exports and that a "cure" of this breach was impossible. ROA.108 ("Bells cannot be unrung, nor the past undone."). The district court agreed, noting Minosa's "plethora of authority for the proposition that a failure to maintain something amounts to an incurable breach of contract in similar contexts where that failure resulted in a violation of the law." ROA.1408. Based on this notion, and because the excess shipments "resulted in a violation of federal law," the court declared that Cyanco's alleged breach "was incurable." *Id.*

### 1. BIS confirmed that Cyanco cured its violation by obtaining the 2023 License.

Minosa's "incurable breach" theory founders on a single, uncontroverted fact: Cyanco "cured" the excess exports. As discussed, OEE investigated the excess exports and found that they were a "good faith" mistake as "a result of human error." ROA.269. OEE noted that "[i]n response to the errors discovered," Cyanco obtained the 2023 License on April 14, 2023. ROA.269. OEE then explained the effect of the

2023 License: "as such, **the excess exports as well [as] future exports will be under this new license**." ROA.269 (emphasis added). In other words—and contrary to Minosa's insistence—the 2023 License permitted Cyanco to go back in time and cover "the excess exports" with "this new license." ROA.269.

Minosa has never disputed the Warning Letter, including BIS's interpretation of the retroactive effect of the 2023 License. Instead, as a review of their summary-judgment briefing shows, Minosa simply ignored that part of the letter. *See* ROA.90-174. The district court's opinion scarcely acknowledges the 2023 License and is wholly silent regarding the Warning Letter. *See* ROA.1399-1410. Neither Minosa nor the district court attempted to answer the most salient question: how can Cyanco's excess exports be "incurable," as a matter of law, when the very federal agency charged with regulating export licenses stated that the 2023 License covered—that is, cured—the excess exports?

> **2. Minosa's "incurable breach" authorities were not decided under Texas law and bear no factual resemblance to this case.**

Having no answer, Minosa cited various out-of-circuit and out-of-state cases to suggest that **any** breach from a "failure to maintain something" and "result[ing] in a violation of federal law" is incurable as a matter of law. ROA.109-11. But Minosa's authorities are entirely distinguishable and reveal no such broad rule. In *Federal Engineers & Contractors, Inc. v. Relyant Global, LLC*, for example, a Tennessee federal court ruled that, under Tennessee law, a party could not cure its breach because the contract

expressly provided for "the right to immediately terminate" in the event of a violation of federal law. No. 3:19-CV-73, 2022 WL 19763248, at *4 (E.D. Tenn. Aug. 11, 2022) ("[U]nder the terms of the subcontract, FE&C did not have a right to retroactively cure such a violation of law."). Thus, that decision was grounded on the determination that the parties' contract did not confer a right to cure, not that a cure was impossible. No such immediate termination clause appears in the Sales Contract.

In *AgTech Scientific*, the district court ruled—with little discussion and no citation of caselaw—that a breach was incurable when it had "resulted in government seizure of [hemp] product." 2020 WL 1975375, at *4. That is, the cure was factually ineffective—the party suffered a consequence that was not undone. Here, again, the relevant government officials, operating under a completely different regulatory regime, ruled that Cyanco's violation did ***not*** merit such sanctions and had been cured. ROA.269-70. Minosa's other cases are even further afield, concerning violations of real estate leases and franchise agreements, with no comparable governmental agency declaring a breach retroactively cured.[29] In short, Minosa provides no authority that would nullify the explanation by BIS that Cyanco's excess exports were covered by the 2023 License.

---

[29] *See D&D Realty Trust*, 2015 WL 5098626, at *4 (failure to maintain continuous insurance coverage); *Kyung Sik Kim*, 66 A.D.3d at 529 (same); *Las Americas, Inc. v. Am. Indian Neighborhood Dev. Corp.*, No. A04-505, 2004 WL 2710061, at *5 (Minn. Ct. App. Nov. 30, 2004) (same); *In re Lee W. Enters.*, 179 B.R. at 209 (franchise agreement with immediate termination provision for non-service by car dealership).

### 3. Minosa's speculation about future civil penalties fails to establish that Cyanco's alleged breach was incurable.

To bolster its incurable-breach theory, Minosa also asserted that Cyanco's excess exports might expose Minosa "to a risk of significant civil penalties under the EAR." ROA.108. By Minosa's telling, that risk was something Cyanco could not cure. ROA.108-09.

Several problems doom this argument. To begin with, this purported "risk" hinges on Minosa being derivatively liable for Cyanco's violation of the EAR. Minosa argued that "federal regulations prohibited it from ordering any additional solid sodium cyanide from Cyanco" once it learned about the excess exports. ROA.105-06. In making this argument, Minosa cited 15 C.F.R. § 764.2(a), which generally prohibits violations of applicable laws, regulations, and export licenses, and 15 C.F.R. § 764.2(e), which specifically prohibits a person from "order[ing], buy[ing], . . . [or] us[ing]" products "with knowledge that a violation of ECRA, the EAR," or any license had occurred or was about to occur. ROA.105. But as discussed above, BIS confirmed that Cyanco itself would face no penalties, fines, or sanctions for the excess exports and that its exports—past and future—were covered by the 2023 License. ROA.269-70.

All Minosa is left with is unfounded speculation that it might somehow still face civil penalties for placing orders with Cyanco, even though Cyanco itself has been cleared to process those orders. This speculation is entirely foreclosed by the BIS Warning Letter. And, as a procedural matter, "unsubstantiated assertions" and

"unsupported speculation are not competent summary judgment evidence." *Liberty Ins. Corp. v. Dixie Elec., L.L.C.*, 637 F. App'x 113, 116 (5th Cir. 2015).

At most, Minosa's musings about possible enforcement proceedings suggest another fact question. In its summary-judgment motion, Minosa recognized that whether it might face prosecution was far from certain—stating that it had not yet received assurances from BIS of non-prosecution, but insisting it "cannot rely on any assurances from Cyanco to BIS." ROA.109. This unresolved fact question is wholly insufficient to establish—as the district court ruled—that the excess exports were incurable as a matter of law. *See Liberty Ins.*, 637 F. App'x at 116.

Finally, and in any event, the Sales Contract contains a mutual indemnification agreement. Under Section 13.2 of the contract, Cyanco agreed to indemnify Minosa for "any claim, loss, damage, [or] cost," including those "arising out of or in connection with…a material breach by [Cyanco] of any of [Cyanco's] obligations or representations under this Contract not timely cured." ROA.221. In the event BIS were to fine Minosa based on Cyanco excess exports, Cyanco would be obliged to indemnify Minosa for those fines. Thus, under no scenario would Minosa suffer incurable or irreparable harm due to the excess exports. Or, at the least, Minosa's assertion creates a question fact question that would preclude summary judgment.

**B.     Minosa failed to meet its summary judgment burden to establish that Cyanco did not "effectively cure" the alleged breach.**

As a fallback to its incurable-breach theory, Minosa argued below that even if Cyanco's alleged breach were curable, Cyanco failed to "effectively cure" the breach because it did not inform Minosa about the 2023 License and the BIS Warning Letter until June 2023, after the Sales Contract was terminated.  ROA.111-12 (MSJ at 17-18).  Thus, Minosa urged, Cyanco did not comply with Section 1.3 and Minosa's termination of the contract was proper.  *Id.*

The district court appeared to agree here as well.  In a footnote, the court stated that Cyanco had "failed to inform Minosa that it had obtained a new export license until June 19, 2023, several months after" Minosa's Termination Notice.  ROA.1408 (Order n.10).  In the court's view, Cyanco had "offer[ed] no justification other than stating that 'nothing in the Sales Contract required Cyanco to provide MINOSA with a copy of its export license for shipping sodium cyanide.'"  *Id.*

Minosa's "effective cure" theory fails for multiple reasons.  *First*, the uncontroverted summary judgment evidence establishes—or at least raises a fact question—that Cyanco complied with Section 1.3(ii).  It is undisputed that Cyanco obtained the 2023 License on April 14, 2023—15 days after Minosa sent its Notice of Breach and well within Section 1.3(ii)'s 30-day window.  ROA.269-70.  It is also undisputed that, according to BIS, Cyanco's acquisition of the 2023 License covered not only "future exports," but also the earlier "excess exports."  ROA.269.  In other words, as discussed above, the 2023 License cured any breach caused by the excess exports.  *See* Argument Section II.A, *supra.*

*Second*, Section 1.3 does not impose the additional requirement posited by Minosa: that Cyanco notify it within 30 days with various details about its cure, including providing the 2023 License itself.   In its summary judgment briefing, Minosa complained that Cyanco "failed to inform Minosa that [it] had obtained" the 2023 License until June 2023.   ROA.111.   Minosa then asserted—without citing any authority—that "in order to effectively cure" its alleged breach, "Cyanco needed to inform Minosa" about the new license in April or May 2023.  *Id.*

This argument finds no footing in the Sales Contract or in Texas law.  As noted, Section 1.3(ii) allows Minosa to terminate the Sales Contract only if Cyanco is "in breach … **and** fails to remedy such breach within thirty (30) days after its receipt of written notice detailing the breach from the non-breaching Party."  ROA.214 (emphasis added). While Section 1.3(ii) requires Cyanco to "remedy" a breach within 30 days, it does ***not also require*** Cyanco to provide Minosa with notice of its cure—a requirement that appears in other contracts but is absent here.  *See Neurobehavioral Assocs.*, 995 S.W.2d at 328 (contract gave breaching party 30 days to cure breach "and so notify the non-breaching party" of the cure).  Minosa cannot fault Cyanco for failing to comply with a contractual requirement that does not exist.  *See Universal Health Servs., Inc. v. Renaissance Women's Grp., P.A.*, 121 S.W.3d 742, 747-48 (Tex. 2003) ("Generally, a court looks only to the written agreement to determine the obligations of contracting parties.").

*Third*, the Court should not imply a separate notice requirement onto the Sales Contract.  As noted, Minosa cited no authority to the district court in support of its

"effective cure" theory. Under Texas law, implied covenants are "not favored" and courts do not "rewrite contracts to insert provisions that the parties could have included, nor do courts imply restraints for which the parties did not bargain." *LG Ins. Mgmt. Servs., L.P. v. Leick*, 378 S.W.3d 632, 638 (Tex. App.—Dallas 2012, pet. denied). While Minosa argued that it would have been "logical" for Cyanco to notify it of the 2023 License earlier, ROA.111, Texas law will not imply a covenant "simply to make a contract fair, wise, or just." *Universal Health Servs.*, 121 S.W.3d at 747-48.

Minosa did not "propose[] or assert[]" an implied-covenant theory in the district court. *Johnson,* 120 F.3d at 1316. In its summary-judgment briefing, Minosa never argued or attempted to demonstrate the existence of an implied covenant. *Id.* Nor did Minosa plead an implied covenant in its answer and counterclaim or in the parties' joint pretrial order. ROA.43-58, 666-907. The Court therefore should not affirm on this basis. *See Johnson,* 120 F.3d at 1316.

*Fourth*, and in any event, the summary judgment evidence raises at least a fact question as to the "effectiveness" of Cyanco's cure. Despite having no contractual obligation to do so, Cyanco responded to Minosa's "Notice of Termination" on April 26, 2023. Cyanco informed Minosa that it had "**_fully discharged_** its obligation to deliver Product to Buyer" and "**_stands ready_** to continue to do so." ROA.263 [R.E. Tab 12] (emphasis added). Even if there were some implied standard for an "effective" cure—which Minosa has never identified—the sufficiency of notice is generally "an inference of fact," based on whether "ordinary minds" might "differ as to the proper

conclusion to be drawn from the evidence." *FinServ Cas. Co. v. Symetra Life Ins. Co.*, 941 F.3d 795, 798 (5th Cir. 2019) (applying Texas law; citations omitted). Here, the "ordinary minds" of the jury might differ as to whether Cyanco's statement that it "stands ready to do so" provided adequate notice to Minosa—assuming such notice were even required. *See id.* Summary judgment may not be affirmed on this basis. *Crowe v. Henry*, 115 F.3d 294, 296 (5th Cir. 1997) ("A factual dispute is 'genuine,' if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.").

## III.   Summary judgment may not be affirmed on Minosa's "excuse" argument.

For similar reasons, summary judgment must be reversed because there are multiple fact questions as to whether any alleged breach by Cyanco was "material," and thus whether Minosa's performance under the Sales Contract was "excused."

The district court erred in ruling that the excess exports—even if they constituted a breach of the Sales Contract—were "material" as a matter of law. ROA.1406-07 (Op. at 8-9). Under Texas law, "a *material* breach excuses the other party from performance." *James Constr. Grp. v. Westlake Chem. Corp.*, 650 S.W.3d 392, 415 (Tex. 2022) (emphasis in original). Materiality "generally presents a dispute for resolution by the trier of fact." *Henry v. Masson*, 333 S.W.3d 825, 835 (Tex. App.—Houston [1st Dist.] 2010, no pet.) This analysis examines five factors: the extent to which the injured party (1) was deprived of the benefit it reasonably expected and (2) may be compensated for that lost benefit; (3) the extent to which the party failing to perform will suffer a forfeiture; (4) the likelihood that the party failing to perform will cure its failure; and (5) the extent to

which the behavior of the party failing to perform comports with standards of good faith and fair dealing. *O'Brien's Resp. Mgmt., L.L.C. v. BP Expl. & Prod., Inc.*, 24 F.4th 422, 435 (5th Cir. 2022) (citing *Mustang Pipeline Co., Inc. v. Driver Pipeline Co., Inc.*, 134 S.W.3d 195, 199 (Tex. 2004)).

Here, Minosa has never argued that it was deprived of any benefit it reasonably expected under the Sales Contract. For example, at no time did Minosa attempt to order sodium cyanide from Cyanco and Cyanco declined to deliver or was precluded from doing so. ROA.196, 208-12. Instead, Minosa argued—and the district court agreed—that the excess exports were a material breach because they rendered Minosa unable to "lawfully order any additional sodium cyanide from Cyanco." ROA.290, 1400. Minosa similarly argued that the excess exports had rendered Minosa's performance "impracticable" because "federal regulations prohibited it from ordering any additional sodium cyanide from Cyanco." ROA.105-06

This is the same speculation discussed above about BIS sanctioning Minosa for participating in Cyanco's excess exports. ROA.107-09; *see* Argument Section II.A.3, *supra*. Again, "unsupported speculation" about future events is "not competent summary judgment evidence." *Liberty Ins. Corp.*, 637 F. App'x at 116. And this speculation collapses when faced with the BIS Warning Letter, which is unrebutted evidence of a valid license covering past and future exports, meaning no "lapse" would render exports made any at time unlawful. ROA.269. *See* Argument, Section II.A, *supra*.

The summary-judgment evidence raises fact questions as to other materiality factors. As discussed, the 2023 License and BIS Warning Letter confirm that the excess exports were cured—showing not just a "likelihood," but the historical fact that any breach was "cure[d]." *O'Brien's Resp. Mgmt.*, 24 F.4th at 435. Again, Minosa has never disputed BIS's conclusions, and the district court did not acknowledge them. And as for whether Minosa's conduct "comport[ed] with standards of good faith and fair dealing," *O'Brien's Resp. Mgmt.*, 24 F.4th at 435, the Warning Letter expressly found that Cyanco's "mistake" was made "in good faith" due to "human error." ROA.269. At a minimum, this unrebutted evidence raises more genuine questions of fact and precludes summary judgment. *Crowe*, 115 F.3d at 296.

## CONCLUSION

Appellant Cyanco International, L.L.C. respectfully prays that the Court reverse and vacate the district court's order granting Minosa's motion for summary judgment and remand this action to the district court for further proceedings.

Respectfully submitted,

*/s/ Samuel E. Joyner, Jr.*
Samuel E. Joyner, Jr.
Thomas F. Allen, Jr.
Ben A. West
FROST BROWN TODD LLP
2101 Cedar Springs Road, Suite 900
Dallas, Texas 75201
Telephone: (214) 545-3472
sjoyner@fbtlaw.com
tfallen@fbtlaw.com
bwest@fbtlaw.com

*Counsel for Appellant*
*Cyanco International, L.L.C.*

# CERTIFICATE OF SERVICE

This is to certify that this Brief of Appellant has been served via the Court's ECF filing system in compliance with Rule 25(b) and (c) of the Federal Rules of Appellate Procedure on July 24, 2025, on all registered counsel of record, and has been transmitted to the Clerk of the Court.

*/s/ Samuel E. Joyner, Jr.*
Samuel E. Joyner, Jr.

# CERTIFICATE OF COMPLIANCE

1.     This brief complies with the type-volume limitation of FED. R. APP. P. 32(a)(7)(B) because:

- This brief contains 12,071 words, excluding the parts of the brief exempted by FED. R. APP. 32(f).

- This brief also complies with the typeface requirements of FED. R. APP. P. 32(a)(5) and the requirements of FED. R. APP. P. 32(a)(6) because:

- This brief has been prepared in a proportionally spaced typeface using Microsoft® Word for Microsoft 365 MSO (Version 2505 Build 16.0.18827.20102) 64-bit with a 14-point font named Garamond.

*/s/ Samuel E. Joyner, Jr.*
Samuel E. Joyner, Jr.

Dated: July 24, 2025